IN THE CIRCUIT COURT OF THE
THIRTEENTH JUDICIAL CIRCUIT,
IN AND FOR HILLSBOROUGH
COUNTY, FLORIDA

**ERICA BRYANT,**

  **Plaintiff,**

v.

**BOARD OF TRUSTEES FOR THE
UNIVERSITY OF SOUTH FLORIDA and
FLORIDA DEPARTMENT OF EDUCATION,**

  **Defendants.**

_____/

CASE NO.: 24-CA-000448
FLA BAR NO.: 0739685

## AMENDED COMPLAINT

  Plaintiff, ERICA BRYANT, hereby sues Defendants, BOARD OF TRUSTEES FOR THE UNIVERSITY OF SOUTH FLORIDA, and FLORIDA DEPARTMENT OF EDUCATION alleges:

### NATURE OF THE ACTION

  1. This is an action brought under Chapter 760, Florida Statutes, 42 U.S.C. § 2000e *et seq.*, 42 U.S.C. § 1981a, and the Florida Whistleblower Act codified in Chapter 112, Florida Statutes.

  2. Jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1343 (civil rights claim jurisdiction).

  3. This action involves claims which are, individually, in excess of Fifty Thousand Dollars ($50,000.00), exclusive of costs and interest.

## THE PARTIES

4. At all times pertinent hereto, Plaintiff, ERICA BRYANT, has been a resident of the State of Florida and was jointly employed by Defendants. Plaintiff is a member of a protected class due to her race. Plaintiff is a protected whistleblower due to her objecting to and/or refusing to participate in practices of Defendant that were in violation of matters set forth in §112.3187(5), Florida Statutes. Plaintiff was retaliated against after reporting Defendant's unlawful employment practices.

5. At all times pertinent hereto, Defendant, BOARD OF TRUSTEES OF THE UNIVERSITY OF SOUTH FLORIDA, has been organized and existing under the laws of the State of Florida. At all times pertinent to this action, Defendant has been an "employer" as that term is used under the applicable laws identified above. Defendant was Plaintiff's employer as it relates to these claims and she was jointly employed with the Florida Department of Education.

6. At all times pertinent hereto, Defendant, FLORIDA DEPARTMENT OF EDUCATION, has been organized and existing under the laws of the State of Florida. At all times pertinent to this action, Defendant has been an "employer" as that term is used under the applicable laws identified above. Defendant was Plaintiff's employer as it relates to these claims and she was jointly employed with the Board of Trustees of the University of South Florida.

## CONDITIONS PRECEDENT

7. Plaintiff has satisfied all conditions precedent to bringing this action.

## **STATEMENT OF THE ULTIMATE FACTS**

8. Plaintiff, an African American female and protected whistleblower, began her employment with Defendants[1] on or about February 18, 2022, and held the position of Federal Program Specialist at the time of her wrongful termination on June 21, 2022.

9. Despite her stellar work performance during her employment with Defendant, Plaintiff was subjected to disparate treatment, different terms and conditions of employment, and held to a different standard because of her race, and because she reported Defendant's unlawful employment activities and was subjected to retaliation thereafter.

10. The disparate treatment and retaliation came at the hands of specifically but not limited to Assistant to Vice Chancellor Amanda Meeks, a white female; Acting Title I Pt. A (TIPA) Director Matthew Wiley, a white male; and Acting Bureau of Federal Educations of Programs ("BFEP") Chief Dinh Nguyen, a non-Black person of color.

11. Plaintiff was only employed with Defendant for a few months, but within that time she was awarded "employee of the month" within her first month of employment because of her exemplary service. Notably, Casey Graham, a white female, and high-level employee of the Defendant, informed Plaintiff that she would have again received this award during her second month of employment had the Defendant not discontinued the practice. Plaintiff did not receive any formal reprimands during her employment. Unfortunately, Plaintiff was not allowed the opportunity to receive an evaluation, as Nguyen and Wiley informed her that she had not been employed long enough to receive one. Nonetheless, Plaintiff completed her job duties without error.

---

[1] Reference to the term "Defendant" refers to both Defendants.

12. During her employment, Plaintiff was subjected to disparate treatment due to her race. Examples include but are not limited to: Plaintiff being publicly and commonly reprimanded for Nguyen's misunderstandings, Plaintiff constantly being micromanaged and observed by supervisory staff to include Wiley, Caldwell, and Nguyen, Plaintiff being left out of meetings pertinent to her work duties, and Plaintiff being denied the opportunity to work from home, whereas white employees such as Casey Graham and Meeks were allowed this privilege at their discretion. In fact, Meeks specifically denied Plaintiff's legitimate request to do so. Also, Plaintiff was forced to train new hires without herself having proper training, despite supervisors such as but not limited to Wiley having minimal responsibilities and enough time to conduct said training.

13. Contrary to the treatment Plaintiff received, white and some non-black employees of color, namely Graham, received favorable treatment from Wiley and were continually prioritized over Plaintiff.

14. Plaintiff witnessed other African American employees be reprimanded and/or subjected to a hostile work environment whereas white employees were not. An example includes but is not limited to: Calah Smith, who was hired a week before Plaintiff and fired soon thereafter for questioning Defendant's work from home policy and requesting an explanation for the denial of her request to work from home as it related to her serious medical/disabling condition. Specifically, Smith was diagnosed with cancer and experienced several home break-ins, in which she was physically harmed, information known to Defendant. Georgina Portillo, an Afro-Latina female, was also denied work from home privileges after her legitimate request. Notably, Meeks also denied both Smith's and Portillos's request to telework and or participated in the denials.

15. Another example includes Program Specialist Jacqueline Hill, an African American female, who was purposely excluded from team meetings and trainings which provided relevant

information to her job duties. Plaintiff would also experience this ostracizing behavior on multiple occasions.

16. Alyssa Tovar, a Hispanic employee, received minimum training after being hired, as Wiley purposefully failed to provide it. The majority of the training Tovar received came from Plaintiff and Calah Smith who were not in a position requiring them to do so, however, they provided it to assist Tovar. Plaintiff later learned that Wiley and Nguyen had been taking advantage of Tovar's work time, assigning her non-related work tasks which impeded her normal job duties.

17. Similar to Tovar, Nguyen also attempted to assign Plaintiff duties outside of her scope of work. Nguyen informed Plaintiff that he wanted the Bureau Chief position, and further advised Plaintiff to do as she was told so that she could secure a permanent position with Defendant, as "everyone" he recommends gets hired.

18. Similar to Plaintiff's exposure to disparate treatment relating to her race, Tovar was appointed as translator for Spanish content, without her approval and at least due in part to her Hispanic origin. Nguyen initiated this appointment and announced it at an employee meeting. Unbeknownst to Tovar, she had to be certified to be a translator and by not having this certification, she would be liable for any mistranslations. Once becoming aware of this information, Tovar protested this title and thereafter experienced ostracizing and retaliatory behavior from Nguyen who stated, "If I don't like you, I will not address or speak to you."

19. On one occasion, Plaintiff witnessed Wiley falsely state that African American employees such as Calah Smith and Jaqueline Hill left employment with Defendant due to low job performance. Plaintiff knew this to be untrue and objected to these false statements.

20. Plaintiff also witnessed Former Interim TIPA Director Shonda Goldsmith, an African American female, being treated unfairly due to her race, which prohibited her from being

5

chosen for a position left vacant for over a year. By way of example, Goldsmith was wrongfully informed that the master's degree she had was not the correct one for the position she was applying for whereas Wiley held a comparable position and did not have a master's degree at all.

21. During Plaintiff's employment, at least nine non-white females were forced to resign or fired during Plaintiff's employment. Each employee cited the hostile work environment as the catalyst for their consecutive departures, with multiple specifying that these acts came from Meeks and/or Capps.

22. In or about March 2022, the former Bureau Chief Michelle Gaines, an African American female, left her employment with Defendant. Thereafter, Plaintiff observed a decline in positive or friendly interactions within the workspace. Notably, by default, Nguyen was the next personnel in charge.

23. Following Gaines' departure, Meeks made contradictory statements insinuating that she does not know what she is doing (pertaining to her job responsibilities), and that she does not have the authority to give clear directives or guidance but would blatantly state that she "knows enough to be dangerous" multiple times. Plaintiff understood these statements to be intimidating, as Meeks' position was created by former Vice Chancellor Melissa Ramsey, a white female, using entitlement program funds. Plaintiff believed this to be a demonstration of active and open quid pro quo.

24. Furthermore, Meeks held one of six positions which were not legitimate hires, as the individuals did not have the proper education, experience, or knowledge which would normally be required. Notably, each of these six unqualified position holders were non-Black. Additionally, Meeks would place her "friends and associates" into key roles that qualified professionals were

not considered for. By way of example only, Wiley, Caldwell, Nguyen, Capps, and Graham, were each appointed to their positions through affiliation with Meeks.

25. In fact, Caldwell was never formally introduced to Plaintiff's department after being hired. Plaintiff only learned of his position once she started escalating her work from home requests for reconsideration. Only then did Plaintiff learn that Caldwell was the USF Liaison, at which point Plaintiff opted not to include him on her requests, as he was affiliated with Meeks and Plaintiff feared retaliation.

26. Based on information and belief, complaints against Meeks have been brought by Local Educational Agencies (LEA) and the Office of Grant Management (OGM) regarding her incompetence, as well as the incompetence of those she has put in positions as they do her bidding. Nonetheless, Meeks has continued to retain employment with Defendant.

27. On or about March 30, 2022, Meeks began to make orders which were later reversed by the new Chancellor and Vice Chancellor. Specifically, Meeks ordered the flagging of any LEA district Amendments that mentioned what was perceived as Critical Race Theory (CRT) in their curriculum or Social Emotional Learning. Meeks mentioned that she would not approve any amendments with those listed or mentioned in their amendments. This was done without statute or policy to support her denials, and this resulted in some districts being negatively affected by her actions without an explanation.

28. Wiley flagged anything that spoke about equality or inequality in America, stating that he was the "guru" for CRT and that upper management comes to him for expertise on the matter. Wiley, however, made insensitive comments regarding race, such as going to Casey Graham, a white female, for his "go-to for Black culture" because she is married to a Black man despite Defendant employing several Black women.

29. In or around this time, Wiley began meeting with Casey Graham, Nguyen, USF Liaison Matthew Caldwell, Director Janet Capps, and Meeks. After one meeting, Wiley began spreading rumors that Meeks was grooming himself and Graham for TIPA leadership roles, which eventually occurred. Wiley also began informing new hires, including Plaintiff, that he was looking to see which employee would compete to be his favorite, prior to his position appointment.

30. Following her denial of her telework request, in or around April 2022, Plaintiff escalated the denial to HR Laura Sorrentino, a white female, for additional consideration. This request was eventually denied.

31. Thereafter, Plaintiff observed Meeks and Nguyen being cc'd on emails sent to Plaintiff by Sorrentino and Nguyen began speaking to Plaintiff in an unpleasant tone, falsely accusing her of not working and being late to work. Additionally, Meeks began displaying passive aggression during meetings and other interactions in which she would stare at Plaintiff in an attempt to gain her attention and intimidate her through facial expressions. Also, Nguyen started micromanaging Plaintiff and watching her as she worked, presumably to find evidence for reprimand and discipline.

32. On May 3, 2022, Plaintiff submitted a second request to newly appointed USF Vice Chancellor Margaret Aune and Nguyen for reconsideration of her telework request. The purpose was to further discuss the circumstances behind Plaintiff's request to telework and explore potential alternative options. During this meeting, Aune commended Plaintiff for her passion for working with children and families.

33. Plaintiff was later approved for Flex-time as an accommodation by Aune.

34. Immediately following this meeting, Nguyen sent out an email requesting all employees to submit all pre-approved leave forms to him.

35. In or around this time, Tovar overheard Meeks ranting to Nguyen about her not being allowed in Plaintiff's meetings with Aune. Meeks then thanked Nguyen for compiling the excel sheet. Meeks then stated something akin to, "(Aune) said that we (Meeks and Nguyen) can't deny them their accrued time, it is theirs to use." Meeks then stated that it was a very critical time as applications were due and must be reviewed by the deadline, additionally stating, "this will not look good when it comes time to renew her contract."

36. Former employee Vashalice Kaaba also informed Plaintiff that she observed Meeks circling the floor while Plaintiff was in meeting with Aune.

37. Sometime later, the Bureau of Federal Education Programs ("BFEP") was conducting a Federal Audit by the USDOE. Correspondingly, Nguyen and Wiley were pressuring new hires, including Plaintiff, to sign off on PSES documentation, as well as other reports, despite these new employees not being employed at the time the reports were written. Capps was in charge of collecting and ensuring the district's PSES data was accurate.

38. The PSES document is very technical and difficult to understand. Only experienced professionals should conduct approval and review for this document, as the USDOE may audit the districts outlined in the case of funds being mishandled. The employee who approves this information will be held directly responsible for any inaccuracies.

39. Plaintiff was out of work from May 31, 2022, to June 3, 2022, and provided a doctor's note as an excused absence.

40. On or around June 8, 2022, Capps sent an email to Wiley, advising that Plaintiff needed to complete documentation for the PSES, in which she was not properly trained to review and did not understand, information known to Defendant. Plaintiff responded in writing that she could not sign nor take responsibility for the approval of that information. In response, Wiley

initiated a meeting between himself, Capps, and Plaintiff, during which Plaintiff's concerns about not being properly trained for a job of that magnitude were disregarded.

41. Again, on or around June 14, 2022, Capps sent a follow-up email to Wiley, insisting that Plaintiff complete documentation for the PSES, which Plaintiff again protested. Correspondingly, Wiley scheduled a second meeting for the following day, which then included Nyugen.

42. On or around June 15, 2022, during the meeting initiated by Defendant, Plaintiff participated in whistleblowing activity, by way of reported her concerns relating to supervisors pressuring her into signing documents that she was not qualified nor trained to sign relating to the PSES.

43. Plaintiff additionally sent an email flagged as very important to Aune, with the subject, "Request For A Meeting." Within this email Plaintiff again reported her concerns relating to supervisors pressuring her into signing documents that she was not qualified nor trained to sign.

44. Aune acknowledged Plaintiff's email and stated that she would schedule a time in the near future to meet, however this never happened.

45. Immediately following the scheduled meeting for that day, Wiley approached Plaintiff's desk attempting to initiate small talk. Plaintiff then informed Wiley that he should leave her alone, because she "can't in good conscience put her (Plaintiff) name and approval to a federal document that I don't understand or agree with." Wiley responded, "this is why we are meeting with Janet Capps." Plaintiff then reiterated that the previously arranged meetings did not provide her with any clarity and any subsequent meetings would also be useless. After Wiley mentioned that Nguyen was present at the meeting, Plaintiff asked why the other new hires were not included, in which Wiley responded "No, they don't need to be in there. This isn't that type of meeting, and

we shouldn't be having this discussion here. (Plaintiff's workspace)" Plaintiff was then instructed that she needed to do her job by Wiley who spoke loudly and confrontationally.

46. The conversation proceeded with Plaintiff reminding Wiley that he previously informed her "not to review applications without reviewing and approving the PSES document" further stating that she completed all of her application reviews which Wiley approved.

47. Following this conversation, Plaintiff requested a neutral party of her choosing to be included in the next meeting. Plaintiff then initiated contact with Data Specialist Valarie Henry, an African American female, who she asked to sit in as her advocate at the meeting. Upon seeing Plaintiff and Henry conversing, Wiley ran into the conference room and then shortly after informed Plaintiff that the meeting would be rescheduled.

48. Despite Wiley's assurances that he had completed the PSES documentation for the previous year, Wiley did not validate his claim by proving that he understood the information within the documentation. Plaintiff later learned that Wiley never completed the review of the PSES document.

49. Employees including Hill, Valerie Henry, and Shonda Goldsmith, all African American females, confirmed that Wiley and Casey Graham did not complete the PSES review as they did not understand it. Notably, Henry was purposely excluded from pertinent meetings regarding PSES and other data subject meetings, despite having the best working knowledge of PSES and data knowledge. Henry advised on multiple occasions not to have the new hires attempt to complete and approve the PSES without proper training as she stated it would take several years to learn PSES, and the new hires had only been there for less than six months. Moreover, Miley, Graham, and other employees from management asked Henry to train them on PSES, due to them not knowing the information and still wanting to train new hires. In fact, when training proved to

11

be too difficult, Wiley stated that he will "just have the new hires do it" in reference to James Glover, Calah Smith, Alyssa Tovar, and Plaintiff, all new hire of whom are not white employees.

50. On June 16, 2022, Wiley was late arriving to work or did not show up at all and missed the previously scheduled meeting with Plaintiff. This behavior was typical for Wiley, however, he was not reprimanded, whereas African American employees would be disciplined for doing this.

51. Later that day, Plaintiff witnessed Caldwell, the USF Liaison, actively looking into her cubicle. Prior to this incident, Plaintiff never had any meaningful interactions with Caldwell and felt that this observation was a specific and targeted event.

52. On or about June 21, 2022, Plaintiff observed Nguyen being noticeably friendly to her and perceived this as being strange. Thereafter, and upon returning to her desk from an impromptu meeting, Plaintiff was approached by Chief of Security Dan Saunders, a white male, who was accompanied by the Captain of Security FNU, an African American female, who stated that she was there because Defendant thought things "might get out of hand" or something similar to. Saunders ordered Plaintiff to shut down her computer, without much reasoning, as she was being fired.

53. During this encounter, Saunders stepped closely to Plaintiff as she began to retrieve her personal items which were not owned by Defendant, later insisting that he walk Plaintiff to her car. Plaintiff consistently denied these offers and eventually found a friendly and unbiased colleague to assist her in bringing her belongings to her car. Plaintiff was wrongfully terminated days after renewing her employment contract with Defendant. Plaintiff was first told that this abrupt change in position was due to Plaintiff's recent poor work ethic, but that there was "no cause" and she could be considered for re-employment.

54. Plaintiff contends that the real reason she was terminated was not legitimate and used as a cover-up for race discrimination, retaliation against Plaintiff for her reporting of race discrimination and for participating in whistleblowing activities.

55. This termination came as a surprise to Plaintiff, as Capps stated more than once that Plaintiff was doing such a great job, and that "it was as if you (Plaintiff) were made for the position."

56. Former employee Calah Smith was also escorted off of the premises in the same manner as Plaintiff on the day she was terminated. Additionally, Plaintiff was specifically named in Calah Smith's discrimination lawsuit versus Defendant as a witness.

57. Shortly before her termination, Plaintiff attempted to take a pay decrease for a separate position outside of her former department, with employee Dr. Hilal Peker who was interested in having Plaintiff work for her and provided a recommendation. During her initial inquiry for position change, Plaintiff communicated to Georgina Portillo that she was looking to relocate due to the unfavorable work environment. Plaintiff submitted an application for this position on June 17, 2022. Regrettably, in retaliation for her participation in whistleblowing activity and/or in continued discrimination based on her protected class, Plaintiff's application was not considered, despite assurances that she would be reappointed. Based on information and belief, Nyugen was at least in part responsible for this.

58. In the days that followed her termination, Plaintiff emailed Aune outlining many of the abovementioned instances of discrimination and retaliation, in addition to pointing out Aune's lack of corrective action. Regrettably, Plaintiff never received a response from Aune.

59. Based on information or belief, Aune and Meeks shared a common assistant, Bailey l/n/u, who could have intercepted the email response.

60. At some point after Plaintiff sent the abovementioned email, Plaintiff received a phone call from a Defendant's employee during which she was subjected to belittlement and aggressive language. The employee questioned her about her allegations regarding whistleblowing disclosures, race discrimination, the absence of corrective action and Defendant's lack of proper chain of command. Still, no corrective action resulted.

61. Prior to Plaintiff's employment period, Defendant employed Anitra Noah, an African American female, who received comparable treatment to Plaintiff after requesting work from home approval. By way of example, Noah contracted COVID-19 shortly after informing Defendant that her children were diagnosed as positive. Regrettably, Defendant neglected to provide Noah work from home status during the interim, and eventually terminated her for frivolous reasons after she reported the disparate treatment to Defendant.

62. Plaintiff has retained the undersigned to represent her interests in this cause and is obligated to pay a fee for these services. Defendant should be made to pay said fee under the laws referenced above.

## COUNT I
## PUBLIC WHISTLEBLOWER RETALIATION

63. Paragraphs 1 through 62 above are incorporated herein by reference.

64. This count sets forth a claim against Defendant under §112.3187, et seq., Florida Statutes.

65. Plaintiff was a public employee protected under the provisions of Chapter 112, Florida Statutes.

66. As stated more specifically in part above, Plaintiff reported and disclosed violations of rules, regulations and laws, and/or malfeasance, misfeasance and/or gross misconduct to persons both inside and outside of her normal chain of command, and to others

having the authority to investigate, police, manage and otherwise remedy the violations of rules, regulations and laws that she reported. Plaintiff also disclosed this information when she participated in investigations, hearings, or other agency inquiries. Plaintiff reported malfeasance, misfeasance, and other acts specifically outlined in §112.3187(5), Florida Statutes.

67. After reporting these matters and/or participating in investigations, hearings, or other agency inquiries, as related in part above, Plaintiff was the victim of retaliatory actions set forth in part above including without limitation her termination.

68. Plaintiff's termination and not being hired into another department with Defendant was causally related to reporting violations of rules, regulations or laws, and/or her reporting malfeasance, misfeasance or gross misconduct, and/or her participating in investigations, hearings or other inquiries, specified in part above.

69. The actions of all employees within Defendant who affected Plaintiff's employment adversely did so at least in part in retaliation against her for her "whistleblowing" activities.

70. As a direct and proximate result of the actions taken against her by Defendant, Plaintiff has suffered injury, including but not limited to past and future wage losses, loss of benefits, emotional pain and suffering, loss of the capacity for the enjoyment of life and other tangible and intangible damages. These damages have occurred in the past, are occurring at present and will occur in the future. Plaintiff is entitled to injunctive relief.

## COUNT II
## RACE DISCRIMINATION

71. Paragraphs 1 through 62 are re-alleged and incorporated herein by reference.

72. This is an action against Defendant for discrimination based upon race.

73. Plaintiff has been and continues to be the victim of discrimination on the basis of her race in that she was treated differently than similarly situated employees of Defendant who are white and non-black, and Plaintiff has been subject to hostility and poor treatment on the basis, at least in part, of her race.

74. Defendant is liable for the differential treatment and hostility towards Plaintiff because it controlled the actions and inactions of the persons making decisions affecting Plaintiff or it knew or should have known of these actions and inactions and has failed to take prompt and adequate remedial action or took no action at all to prevent the abuses to Plaintiff.

75. Furthermore, Defendant has knowingly condoned and ratified the differential treatment of Plaintiff as more fully set forth above because it has allowed the differential treatment and participated in same.

76. Defendant's known allowance and ratification of these actions and inactions actions created, has perpetuated and facilitated an abusive and offensive work environment within the meaning of the statutes referenced above.

77. In essence, the actions of agents of Defendant, which were each condoned and ratified by Defendant, were of a race-based nature and in violation of the statutes referenced above.

78. The discrimination complained of herein has affected and continues to affect a term, condition, or privilege of Plaintiff's employment with Defendant. The events set forth herein have led, at least in part, to adverse actions against Plaintiff.

79. Defendant's conduct and omissions constitutes intentional discrimination and unlawful employment practices based upon race in violation of the statutes referenced above.

80. As a direct and proximate result of Defendant's conduct described above, Plaintiff has suffered emotional distress, mental pain and suffering, past and future pecuniary losses,

inconvenience, mental anguish, loss of enjoyment of life and other non-pecuniary losses, along with lost back and front pay, interest on pay, bonuses, and other benefits. These damages have occurred in the past, are permanent and continuing. Plaintiff is entitled to injunctive/equitable relief.

## COUNT III
## RETALIATION

81. Paragraphs 1 through 62 are re-alleged incorporated herein by reference.

82. This is an action against Defendant for unlawful retaliation after Plaintiff reported unlawful employment practices adversely affecting her under 42 U.S.C. § 2000e *et seq*. and 42 U.S.C. § 1981a.

83. Defendant is an employer as that term is used under the applicable statutes referenced above.

84. The foregoing unlawful actions by Defendant were purposeful.

85. Plaintiff voiced opposition to unlawful employment practices during her employment with Defendant and has been the victim of retaliation thereafter.

86. The events set forth herein have led, at least in part, to adverse actions against Plaintiff.

87. Plaintiff is a member of a protected class because she reported unlawful employment practices and has been the victim of retaliation thereafter. There is thus a causal connection between the reporting of the unlawful employment practices and the adverse employment action taken thereafter.

88. As a direct and proximate result of the foregoing unlawful acts and omissions, Plaintiff has suffered mental anguish, emotional distress, expense, loss of benefits, embarrassment, humiliation, damage to reputation, illness, lost wages, lost opportunities, loss of capacity for the

17

enjoyment of life, and other tangible and intangible damages. These damages are continuing and are permanent. Plaintiff is entitled to injunctive/equitable relief.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendant for the following:

(a) that process issue and this Court take jurisdiction over this case;

(b) that this Court grant equitable relief against Defendant under the applicable counts set forth above, mandating Defendant's obedience to the laws enumerated herein and providing other equitable relief to Plaintiff;

(c) enter judgment against Defendant and for Plaintiff awarding all legally-available general and compensatory damages and economic loss to Plaintiff from Defendant for Defendant's violations of law enumerated herein;

(d) enter judgment against Defendant and for Plaintiff permanently enjoining Defendant from future violations of law enumerated herein;

(e) enter judgment against Defendant and for Plaintiff awarding Plaintiff attorney's fees and costs;

(f) award Plaintiff interest where appropriate; and

(g) grant such other further relief as being just and proper under the circumstances, including but not limited to reinstatement.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury on all issues herein that are so triable.

Respectfully submitted,

/s/ Marie A. Mattox
Marie A. Mattox [FBN 0739685]
MARIE A. MATTOX, P. A.
203 North Gadsden Street
Tallahassee, FL 32301
Telephone:  (850) 383-4800
Facsimile:   (850) 383-4801
Marie@mattoxlaw.com
Secondary emails:
marlene@mattoxlaw.com
michelle@mattoxlaw.com
discovery@mattoxlaw.com

ATTORNEYS FOR PLAINTIFF

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and accurate copy of the foregoing has been served on all counsel of record by eportal this 11th day of March, 2024.

/s/ Marie A. Mattox
Marie A. Mattox